Eric H. Gibbs (SBN 178658)
Rosemary M. Rivas (SBN 209147)
Joshua J. Bloomfield (SBN 212172)
Rosanne L. Mah (SBN 242628)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
ehg@classlawgroup.com
rmr@classlawgroup.com
jjb@classlawgroup.com
rlm@classlawgroup.com

*Attorneys for Plaintiff Lyon Fitness, LLC*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| LYON FITNESS, LLC, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PAYPAL HOLDINGS, INC., a Delaware Corporation, and PAYPAL, INC., a Delaware Corporation, | |
| Defendants. | |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.     NATURE OF ACTION ................................................................................................ 1

II.    PARTIES ................................................................................................................... 3

III.   JURISDICTION AND VENUE ................................................................................ 3

IV.    DIVISIONAL ASSIGNMENT ................................................................................. 4

V.     FACTUAL ALLEGATIONS .................................................................................... 4

    A.     Defendants Promote the PayPal Honey Extension Browser as a Savings Tool for Consumers ......................................................................................... 4

    B.     Defendants Exploit Influencers to Promote the Honey Browser Extension .......... 8

    C.     The Honey Browser Extension Does Not Offer Consumers the Best Discounts . 13

    D.     The Honey Browser Extension Surreptitiously Diverts Influencers' Commissions to Defendants ............................................................ 14

    E.     Influencers Complain About Honey's Practices ................................................. 18

    F.     Plaintiff's Experience ........................................................................................ 19

VI.    CLASS ACTION ALLEGATIONS ........................................................................ 20

VII.   TOLLING OF THE STATUTES OF LIMITATIONS ............................................. 23

VIII.  CAUSES OF ACTION ........................................................................................... 24

    COUNT ONE
    VIOLATION OF LANHAM ACT – FALSE ADVERTISING ......................................... 24

    COUNT TWO
    VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL.
    BUS. & PROF. CODE § 17200, ET SEQ. ..................................................................... 26

    COUNT THREE
    INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
    ADVANTAGE ............................................................................................................... 28

    COUNT FOUR
    INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS .................... 29

    COUNT FIVE
    CONVERSION .............................................................................................................. 30

    COUNT SIX
    UNJUST ENRICHMENT ............................................................................................... 31

PRAYER FOR RELIEF ...................................................................................................... 32

DEMAND FOR JURY TRIAL ............................................................................................ 33

TABLE OF CONTENTS

Plaintiff Lyon Fitness, LLC, individually and on behalf of all others similarly situated, alleges the following based on its experience and its counsel's investigation against Defendants PayPal Holdings, Inc. and PayPal, Inc. ("Defendants"):

## I. NATURE OF ACTION

1.      Defendants own and operate PayPal Honey ("Honey"), a browser extension used by millions of consumers who were tricked into installing it on their computers. A browser extension is a software program that provides certain features or functionality to a web browser like Chrome, Firefox, and Safari.

2.      Defendants have spent millions of dollars on advertising promising consumers that if they downloaded the Honey browser extension, when they shop online Honey will scour the internet for them to find them the best discount codes on products and services. So, instead of consumers having to search online themselves for discount codes, Honey would do the work automatically for them.

3.      A recent video called "Exposing the Honey Influencer Scam," by a popular YouTuber, however, has revealed the truth about Honey. Defendants' representations about Honey are false and misleading and made to lure consumers in so that Defendants can cheat influencers out of earned referral fees and commissions for products and services they promote through affiliate marketing. The Honey browser extension is designed to operate right at the end of the online checkout process to replace an influencer's affiliate marketing cookies with Honey's, thereby allowing Defendants to take credit for the sale and corresponding commission.

4.      Instead of automatically scouring the internet to find and offer consumers the best coupons or discount codes for online purchases, many times Honey will tell consumers it could not find any coupons or discount codes, although working discount codes are available on the internet. Other times when Honey does find coupons or discount codes, manual searches on the internet will turn up better working codes for more savings. Moreover, if a user manually searches and finds better coupons or discount codes online and submits them to Honey, Honey will not add the coupon or discount code to the database so that it is available for other Honey users.

CLASS ACTION COMPLAINT

5.    Defendants' false promises about the Honey browser extension and their practice of surreptitiously replacing influencers' affiliate marketing cookies with Honey's have harmed influencers with whom Defendants compete for affiliate marketing commissions.

6.    Retailers often engage in affiliate marketing with influencers that have a network of followers on Instagram, YouTube, TikTok, and other platforms. Influencers have loyal followers who trust their recommendations on products and services. Influencers generate income by promoting products and services to their followers, who purchase the products and services through the affiliate links that influencers provide. When influencers generate a sale through their affiliate links, the retailers pay them a referral fee or commission.

7.    Honey, however, allows Defendants to divert the referral fees to themselves for those consumers who installed the browser extension. Specifically, when a consumer is on the checkout page of an online retailer, ready to purchase a product or service in their cart, Honey pops up at the last minute with the promise of potential savings to entice consumers to "click" on the pop-up generated by the browser extension.

8.    When the consumer clicks on the Honey pop-up box—whether a discount is available or not—Honey replaces the influencer's affiliate marketing cookies with its own, allowing Defendants to take credit for the conversion and the commission that goes along with it, although the commission rightly belongs to the influencer who directed the consumer to the retailer's website to buy the product or service in the first place.

9.    Hundreds of thousands of hardworking online influencer marketers who rely on commissions for their livelihoods have lost millions of dollars because of the Honey browser extension.

10.    Plaintiff, individually and on behalf of all others similarly situated, brings statutory claims for violations of the Lanham Act and California's Unfair Competition Law, and common law claims for intentional interference with prospective economic advantage, intentional interference with contractual relations, conversion, and unjust enrichment, and seeks all available monetary and equitable relief, including an injunction prohibiting Defendants from the practices alleged herein.

## II.    PARTIES

11.    Plaintiff Lyon Fitness, LLC's principal place of business is in Austin, Texas. Plaintiff is a citizen of Texas.

12.    PayPal Holdings, Inc. is a Delaware corporation headquartered in San Jose, California and is a citizen of both California and Delaware.

13.    PayPal, Inc. is a Delaware Corporation headquartered in San Jose, California and is a citizen of both California and Delaware.

14.    PayPal Holdings, Inc. holds all the assets and liabilities of PayPal, Inc. PayPal Holdings, Inc. and PayPal, Inc. are collectively referred to in this Complaint as "PayPal."

15.    In 2020, PayPal purchased the Honey Science Corporation, which originally developed the Honey browser extension. PayPal owns and operates the Honey Science Corporation and the term "PayPal" in this complaint, unless otherwise noted, encompasses Honey.

## III.    JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least one hundred members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs, and this is a class action in which one or more members of the proposed Class, including Plaintiff, are citizens of a state different from Defendants. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

17.    This Court may exercise jurisdiction over Defendants because at least one defendant is headquartered in this District; both have sufficient minimum contacts in this District; and intentionally avail themselves of the markets within this District through the promotion, sale, and marketing of their services, thus rendering the exercise of jurisdiction by this Court proper and necessary.

18.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims emanated from this District.

CLASS ACTION COMPLAINT

## IV. DIVISIONAL ASSIGNMENT

19.     Intra-district assignment to the San Jose division of the Court is proper under Local Rule 3-2(e), because a substantial number of the events or omissions giving rise to the claims arose in Santa Clara County, where PayPal is headquartered and conducts business.

## V.     FACTUAL ALLEGATIONS

### A.    Defendants Promote the PayPal Honey Extension Browser as a Savings Tool for Consumers

20.     On November 20, 2019, PayPal announced a deal to buy Honey Science Corporation for $4 billion. Honey Science Corporation, co-founded by George Ruan and Ryan Hudson, touted itself as a company focused on building tools to help consumers save time and money when shopping online.[1] Initially, the company started as a browser extension and later offered additional products. A browser extension is a piece of software that adds features to a web browser or to programs used in a browser.[2]

21.     PayPal's acquisition was completed on January 6, 2020. In its 10-Q filed with the SEC on May 7, 2020, PayPal stated: "We completed our acquisition of [Honey] in January 2020 by acquiring all outstanding shares for total consideration of approximately $4.0 billion . . . We believe our acquisition of Honey will enhance our value proposition by allowing us to further simplify and personalize shopping experiences for consumers while driving conversion and increasing consumer engagement and sales for merchants."[3]

22.     In June 2022, PayPal rebranded the Honey browser extension product as "PayPal Honey," but it is still referred to as Honey.

---

[1] *See* https://investor.pypl.com/news-and-events/news-details/2020/PayPal-Completes-Acquisition-of-Honey/default.aspx (last visited Jan. 13, 2025).

[2] *See* https://www.microsoft.com/en-us/edge/learning-center/everything-to-know-about-browser-extensions?form=MA13I2 (last visited Jan. 13, 2025).

[3] *See* https://www.sec.gov/Archives/edgar/data/1633917/000163391720000093/pyplq1202010-q.htm at p. 15 (last visited Jan. 13, 2025).

4

23.    Defendants tout Honey as a free browser extension that purportedly helps consumers save money by scouring the internet for all available coupons and discount codes, and then automatically applying them when a consumer completes an online purchase.[4]

24.    Installation of the browser extension is a simple process, which can be accomplished in "two clicks. [5]" Honey expressly represents to consumers that once the browser extension is installed, they no longer need to conduct time-consuming manual searches for online coupons and discount codes, because Honey automatically does this for them – with far superior speed and efficiency.[6]

25.    Among other things, Defendants represent that with Honey, consumers "automatically apply the best available coupons[.]" Defendants also represent that "[o]ne click and Honey applies the best available coupon codes to your cart at checkout." These misrepresentations can be found in app stores like Apple's and are reflected in the images below:

 

---

[4] *See* https://www.joinhoney.com/ (last visited Jan. 13, 2025).

[5] *See* https://www.youtube.com/watch?v=3R-5O7BHZyg (last visited Jan. 13, 2025).

[6] *See* https://www.joinhoney.com/ (last visited Jan. 13, 2025).

26.    On the PayPal Honey website, Defendants make similar misrepresentations. Among other things, Defendants represent: "Find the latest cash back offers and coupon codes while you browse online. Our shopping extension automatically searches for you. Then applies the best one it can find at checkout." Other misrepresentations Defendants make are reflected in the images below:





6

CLASS ACTION COMPLAINT



27.    Honey has become a household name. NerdWallet picked Honey as its top browser extension for online shopping in 2023.[7] Android Authority included Honey on its list of "The 15 best Chrome extensions for 2024."[8] Android Authority repeats Honey's claims, namely, that Honey "actively scans the web for valid coupon codes and discounts as you shop on supported websites. With a simple click of the 'Apply Coupons' button during checkout, Honey automatically tests and applies the best coupon codes available. This eliminates the hassle of

---

[7] *See* https://www.nerdwallet.com/article/finance/browser-extensions-online-shopping (last visited Jan. 13, 2025).

[8] *See* https://www.androidauthority.com/best-chrome-extensions-3341953/ (last visited Jan. 13, 2025).

manually searching for codes and ensures that you never miss out on potential savings." CNET likewise promotes Honey, including it in a December 2, 2024, article titled "Looking for the Lowest Price? Let These Browser Extensions and Apps Do the Work for You.[9]"

28.    Defendants' representations about the Honey browser extension are false and/or misleading, however, as explained in more detail below. In fact, in 2020, the Better Business Bureau's National Advertising Division opened an inquiry into a Honey advertisement that claimed, "With just a single click, Honey will find every working code on the internet and apply the best one to your cart," according to a BBB National Programs news release.[10]

29.    After the inquiry was opened, however, Honey informed the National Advertising Division that it had been in the process of discontinuing the ad for "business reasons," according to a BBB National Programs news release. Honey also agreed to permanently discontinue the related advertisements. Thus, the National Advertising Division inquiry was closed.[11]

**B.    Defendants Exploit Influencers to Promote the Honey Browser Extension**

30.    Honey gained visibility and popularity with consumers in part by Defendants' extensive use of online influencer marketing to promote Honey. Online influencer marketing is a marketing strategy where brands collaborate with influencers to promote their products or services. According to the authors of the white paper titled, "Online Influencer Marketing," "Online influencer marketing (OIM) has become an integral component of brands' marketing strategies . . . the use of OIM allows firms to leverage influencers' resources including their follower network, personal positioning, communication content, and follower trust."[12] "Changes in consumer

---

[9] *See* https://www.cnet.com/tech/services-and-software/looking-for-the-lowest-price-let-these-browser-extensions-and-apps-do-the-work-for-you/ (last visited Jan. 13, 2025).

[10] *See* https://www.usatoday.com/story/tech/news/2024/12/26/honey-paypal-coupon-finder-controversy/77175420007/ (last visited Jan. 13, 2025).

[11] *See id.*

[12] *See* Leung Fine F., Gu Flora F., Palmatier Robert W. (2022), "Online Influencer Marketing," *Journal of the Academy of Marketing Science*, 226–51.

CLASS ACTION COMPLAINT

behavior have propelled OIM. Consumers express growing skepticism toward brands' direct marketing and are less inclined to trust traditional advertising (Gerdeman, 2019)."[13] Enter influencers.

31. "Influencers" are people or organizations with large social media followings and a perceived level of expertise in their field. They can influence their followers' buying habits and actions by sharing sponsored content on social media platforms.

32. Influencers invest significant time and effort to create valuable content that allows them to maintain relevance and grow their platforms. They generate new and engaging content ideas to keep their audience interested; develop an understanding of the algorithms of different platforms to optimize content to reach a wider audience; spend long hours creating, editing, and promoting content across multiple platforms; interact with followers through comments, replies, and live streams; and negotiate and manage collaboration agreements with brands. Influencers work very hard to create the revenue streams that support their creative output.[14]

33. Influencer marketing benefits brands because it helps build brand awareness, promote products on a budget, and add a personal touch. Due to its perceived ability to create genuine connections, target specific audiences, and drive engagement, influencer marketing has become an integral part of modern marketing strategies and is expected to continue growing.

34. The influencer marketing industry was expected to reach $24 billion by 2024, up from $1.7 billion in 2016. In 2023, influencer marketing spending grew more than three times faster than social ad spending in the United States. Brands are increasingly using micro-influencers, who have smaller but highly engaged followings. An influencer's value is usually based on their social media following size and the platform they use.[15]

---

[13] *See id.*

[14] *See* https://medium.com/@lifetoken/10-reasons-why-influencers-struggle-to-make-it-4b4e479a5fab (last visited Jan. 13, 2025).

[15] *See* https://influencermarketinghub.com/influencer-marketing-benchmark-report/ (last visited Jan. 13, 2025).

CLASS ACTION COMPLAINT

35.    Authors Fine F. Leung, Flora G. Gu, and Robert W. Palmatier interviewed and collected narratives from practitioners and consumers regarding the role of influencers in marketing.[16] These interviewees and their comments confirmed the importance of online influencer marketing. Some of the comments were as follows:

- "Everyone knows that traditional advertising like TV commercials is just advertising. But the recommendations made by influencers feel more self-motivated, real, and trustworthy."

- "Influencers are not distant from their followers; we feel very close to them. They spend a lot of time answering followers' messages and interacting with them, and you look at them and feel like you know them personally."

- "I think online influencers have close relationships to their community. They often share about their real life or real self-at least that is what they try to project. They show their vulnerable side, talk about what is going well or wrong in their life, and share their concerns. Based on that they can build trust and kind of a friendship relationship with followers. I feel much more related to and have more trust in them."

- "Some influencers are really good at testing products and giving product reviews, so they are great for reinforcing our products' great taste and quality. Some influencers are family-oriented and have a group of mommy followers, so they can help position our brand as a family product. Other influencers are good at leading trends so they can help us position as a trendy ice cream brand."

- "This online influencer provides a lot of content that suits my taste and meets my needs, so to continue obtaining these contents, I pay attention to this influencer."

- "Influencers are very familiar with the kind of content their followers like and can integrate their followers' preferred content with branded content. For example,

---

[16] *See* Leung Fine F., Gu Flora F., Palmatier Robert W. (2022), "Online Influencer Marketing," *Journal of the Academy of Marketing Science*, 226–51.

CLASS ACTION COMPLAINT

some influencers we worked with can integrate information about our food products into their tweets about post-workout meals that their following are interested in."

- "Influencers have distinctive styles. For example, some foodie influencers are food critics who know how to comment on the taste of dishes professionally, while some influencers portray a high-end lifestyle by sharing their experiences at pricey restaurants. There are also foodie influencers who are young, good looking, and trendy. They are great for promoting new cafes or hip restaurants. I match them with different clients according to the clients' needs."[17]

36.    Creating content can be a full-time job and influencers need to make a living. One method by which influencers can earn money for their marketing efforts is by entering into contracts with brands and retailers who will pay them commissions on the products they promote.

37.    For example, after watching a YouTube influencer's video about a product, a viewer might decide to buy the product. The viewer might then scroll down and click the influencer's affiliate link to reach a retailer's website. The affiliate link is a unique link that tells the retailer the consumer was sent there by the specific influencer.[18]

38.    The affiliate link creates a tracking tag that is saved in the form of a cookie. This ensures that even if the consumer waits a few days instead of buying immediately, the influencer who referred the shopper would nevertheless get credit for the sale and receive a commission.[19]

39.    In affiliate marketing, there are different types of marketing attribution models to determine who receives a commission for a referred sale. The model used in the industry is the "last click attribution" model. "Last click attribution" gives 100% of the conversion credit to the ad or affiliate link that received the last click before the sale.

---

[17] *Id.*

[18] *See* https://www.shopify.com/blog/how-to-make-affiliate-links (last visited Jan. 13, 2025).

[19] *Id.*

CLASS ACTION COMPLAINT

40.    PayPal VP of corporate communications Josh Criscoe recently acknowledged in an email to *The Verge* that the industry standard affiliate commission structure is last click attribution.[20]

41.    This means that the affiliate associated with the last link a consumer clicks before purchasing a product or service gets credit for the sale, and therefore the commission.[21]

42.    For example, a consumer might click on a YouTube influencer's affiliate link for a pair of sunglasses but decide not to buy them right away. If the same consumer later clicks on a blogger's link for the same pair of sunglasses and completes the purchase, the blogger gets credit for the sale and the commission, since that was the last click. The YouTube influencer would get nothing.[22]

43.    There are hundreds of thousands of small creators, bloggers, YouTubers, podcasters, and artists who rely on affiliate commissions to support their work, and they spend countless hours creating content to share with their followers.[23]

44.    Understanding the reach and importance of influencers, Defendants targeted them to increase the number of consumers using the Honey browser extension.

45.    In addition to direct television commercials and online advertisements to consumers, Defendants deployed an extensive marketing campaign designed to reach a legion of popular influencers, including online bloggers, content creators, and YouTubers to extensively market the Honey browser extension.

46.    Defendants sponsored almost 5,000 videos across roughly 1,000 different YouTube channels attracting 7.8 billion views. As a result of Defendants' efforts and the participation of

---

[20] *See* https://www.theverge.com/2024/12/23/24328268/honey-coupon-code-browser-extension-scam-influencers-affiliate-marketing (last visited Jan. 13, 2025).

[21] *See* https://matomo.org/blog/2024/03/last-click-attribution/#:~:text=Linear,both%20BoFu%20and%20ToFu%20activities (last visited Jan. 13, 2025).

[22] *Id.*

[23] *See* https://www.youtube.com/watch?v=vc4yL3YTwWk (last visited Jan. 13, 2025).

CLASS ACTION COMPLAINT

numerous influencers, approximately 20 million users downloaded and installed the Honey browser extension.[24]

**C.    The Honey Browser Extension Does Not Offer Consumers the Best Discounts**

47.    Unbeknownst to consumers and influencers alike, the representations that the Honey browser extension helps consumers find the best discounts are false and misleading. Honey does not help consumers find the best discounts and in many situations, Honey provides no discounts at all during the check-out process.[25]

48.    Manual searches frequently turn up working discount codes when Honey says there are not any. Valid discount codes better than the ones Honey offers are also available. And even when these manually discovered superior discount codes were used, Honey did not add them to its database. Oftentimes, Honey offers only Honey branded coupons.[26]

49.    The Honey browser extension does not find consumers the best discounts because Defendants partner with online retailers and tell them that they are allowed to select the discounts Honey presents to consumers at check out.

50.    Honey also tells retail partners they can create a Honey Branded Code which allows them to "choose a promotion and create a code they want to provide to Honey users."

51.    Thus, contrary to the representations that consumers are getting the best deals through Honey and do not need to hunt for the best discount codes, Honey feeds consumers the coupon codes that retailers select although there may be better discounts codes elsewhere.[27]

52.    Because consumers were tricked into thinking that with Honey, they can be sure they are getting the best possible deal, consumers do not bother manually hunting for discounts and coupons.

53.    Honey's marketing to consumers is therefore false and misleading and harmful to influencers and consumers. Defendants' representations promise consumers they will get the best

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *See id.* and https://www.youtube.com/watch?v=vc4yL3YTwWk (last visited Jan. 13, 2025).

CLASS ACTION COMPLAINT

deals possible but at the same time Honey tells business partners they can select the discounts Honey offers to consumers, which may offer smaller discounts than what is available on the internet.

### D.    The Honey Browser Extension Surreptitiously Diverts Influencers' Commissions to Defendants

54.    After being installed and used by consumers based on false representations, Defendants use the Honey browser extension to circumvent the last click attribution standard and have retailers pay Defendants the sales commissions instead of influencers.

55.    When a consumer clicks an influencer's affiliate link for a product, they are taken to the page for that product or service on the retailer's website. If the consumer wants to buy the product or service, they add it to their cart and then go to the checkout page.

56.    Once the consumer is on the checkout page with the product or service in their cart, demonstrating a strong intent to purchase regardless of any available discount, Honey exploits and manipulates the "last click attribution" model in a variety of ways. Each method is designed to allow Honey to inject itself before the sale is completed and get the "last click" and the commission that comes with it.[28]

57.    One tactic is for Honey to notify consumers through the browser extension that Honey has found discount codes for the chosen product. (But as discussed above, these discount codes usually do not represent the best discounts.) When the consumer clicks on the "apply discounts" link in the pop-up box opened by the Honey extension, Honey discreetly opens a small new tab that acts like a simulated referral click, as if Honey had referred the consumer to the website even though they were already there on the checkout page with the product in their cart.[29] Below is an image that reflects this process:

---

[28] *See* https://www.youtube.com/watch?v=vc4yL3YTwWk (last visited Jan. 13, 2025).
[29] *See id.*



58.     Honey then removes the influencer's affiliate cookie and replaces it with its own, claiming credit for the sale and pocketing the commission for itself. Once the page has loaded and the referring affiliate's link has been replaced with Honey's, the tab automatically closes, leaving the consumer unaware that the influencer's commission was poached.[30]



59.     A second tactic Honey employs to cheat influencers of their sales commissions involves a pseudo cash back program known as PayPal Rewards (formerly Honey Gold).

---

[30] *See id.*

60.    Under the PayPal Rewards program, Honey users earn points when they take advantage of offers available to them when they use Honey features. Points are offered only on eligible purchases, from retail partners who participate in the program. Once consumers earn points, they can apply them towards purchases when using PayPal checkout or redeem them for cash back or a charitable donation.[31]

61.    Pursuant to the PayPal Rewards program, instead of offering consumers a discount code, Honey offers them a nominal "reward" in the form of points. So, when a consumer clicks on the pop-up box to claim their reward right before completing a purchase, Honey overwrites the affiliate's cookie and replaces it with its own cookies, thereby allowing it to receive the sales commission instead of the influencer who is actually responsible for the sale. Below is an image from MegaLag, the YouTuber who exposed Honey, showing this process:



62.    MegaLag conducted an experiment to test his hypothesis that the use of PayPal Rewards redirects commissions from influencers to PayPal. He used his affiliate relationship with a company called NordVPN as a test case. Under normal circumstances, when MegaLag's affiliate

---

[31] *See* https://www.paypal.com/us/cshelp/article/what-is-paypal-rewards-and-how-does-it-work-help958 (last visited Jan. 13, 2025).

CLASS ACTION COMPLAINT

link is used to purchase a particular NordVPN product, the company rewards him with a commission of about $35.

63.     MegaLag made two purchases at NordVPN using his own affiliate link – one without clicking the Honey browser extension's "Activate Cash Back" button and another after clicking it. In the first instance, he received the expected commission. In the second, he earned no commission, but received around 89 cents in PayPal Rewards credit, with PayPal pocketing the rest.  Below is an image from MegaLag showing the results of his experiment:



64.     Finally, even when Honey has nothing at all to offer consumers – no discounts and no Honey Gold/PayPal Rewards points – it still manipulates consumers' sales so it can win the "last click" and the commission that comes with it.

65.    To illustrate: a consumer clicks an affiliate link, puts the recommended product or service in their cart and goes to the checkout page. Despite having nothing to offer, Honey nevertheless launches a pop-up box in which the consumer can click "Got it" or "Pay with PayPal" or some other message. If the consumer takes the bait and clicks, Honey also wins the "last click" and the commission that comes with it. Below is an image from MegaLag depicting this scenario:



66.    Thus, even in situations where Honey found no discounts and offers no reward points, it takes credit for the sale and snatches the commissions from unsuspecting influencers who did the work in promoting the product and influencing their followers to the checkout page.

67.    In MegaLag's video describing his investigation, he outlined the entire process above. He also reached out to Honey directly to question it about this conduct. Honey did not deny it, replying on June 3, 2022: "If Honey is activated & is the last program used while shopping on a site, it's likely Honey'll receive credit for the order. But, if the client/influencer's affiliate code/link was the last program associated with the order during shopping, they'll receive credit for the order[.]"

**E.    Influencers Complain About Honey's Practices**

68.    Since MegaLag's exposé became public, numerous influencers have expressed outrage.

69.    Below are some of the messages that influencers have posted about Honey:

- Marques Brownlee, a YouTube creator with 19.7 million subscribers who partnered with Honey in the past, said in his own December 31 video explaining the controversy:

  "Obviously, if I had known any of this, I never would've worked with Honey."

- Austin Evans, a YouTube creator with 5.61 million subscribers who has worked with Honey in the past, said in a December 23, 2024, video:

  "It is completely unacceptable that Honey is acting in this sort of way. I will, under no circumstances, work with Honey ever again. And I hope this is a lesson for you, because it's not just about influencers getting our money stolen from Honey, they're also promising you to find these great deals, and in fact, they're hiding them behind the highest bidder."

- Hank Green, a YouTube creator with 2.1 million subscribers, said in his own December 24 video responding to MegaLag's investigation:

  "I think the big bad guy in this story is Honey. I think the second big bad guy is PayPal, who was like, 'Yeah, that is a great business model! We love that and we're going to make you billionaires for creating it, for stealing, basically, and lying, for both stealing and lying.' But the other villain is the way the sort of small business ecosystem of creators has been set up... for a bunch of small businesses to have to figure out how to make money somehow, and that, I feel like, is ripe for exploitation."

- A spokesperson for Linus Media Group, which runs the 16.1 million subscriber Linus Tech Tips YouTube channel, said in a social media forum in March 2022:

  "We ended the partnership with Honey due to the way their service interacted with affiliate links. Essentially, if someone clicked on an affiliate link (For example, one of ours below in the video description on YouTube), and then if they 'use honey' and search for a deal, Honey will override that tracking link even if they don't find you a deal. That didn't jive with us, so we ended the partnership."

### F.    Plaintiff's Experience

70.    Plaintiff Lyon Fitness, LLC, is a business registered in the state of Texas run by Patrick Lyons, an Austin, Texas-based fitness YouTuber, bodybuilder and coach. Through his work and the social media content he creates, Mr. Lyons strives to help and inspire people around the world to achieve their fitness goals.

71.    Using the social media handle @patricklyons, Plaintiff is active on Instagram, Facebook, TikTok, YouTube and LinkedIn. It has garnered 225,000 followers across all platforms, including 102,000 on YouTube. Plaintiff has invested a great deal of effort, time and

19

CLASS ACTION COMPLAINT

money developing a social media following that appreciates and supports its work and the content it creates. Its largest affiliate business driver is Instagram where it has 40,000 followers.

72.    Plaintiff generates income through affiliate marketing and over the last seven years has partnered with more than 100 brands. Plaintiff's brand partners pay it commissions ranging from approximately two to twenty percent on the sales it refers them. Plaintiff earns thousands of dollars per year in commissions from affiliate marketing.

73.    When Plaintiff's followers who use the Honey browser extension purchase products through Plaintiff's affiliate links, the Honey browser extension overrides Plaintiff's affiliate marketing cookies and replaces them with Honey's, causing Plaintiff to lose money to which it is entitled.

## VI.    CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action individually and on behalf of all other persons similarly situated (the "Nationwide Class") pursuant to the Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4) initially defined as follows:

> All persons and entities in the United States who participated in an affiliate referral or commission program with a United States eCommerce merchant and had referral fees or commissions diverted to PayPal as a result of the Honey browser extension.

73.    The Nationwide Class is referred to herein as "Class."

74.    Excluded from the proposed Class are Defendants, any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants; and judicial officers to whom this case is assigned and their immediate family members.

75.    Plaintiff reserves the right to re-define the Class definition after conducting discovery.

76.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**. On information and belief, the number of Class members is in the tens of thousands. The Class members are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown

to Plaintiff currently. The parties will be able to identify Class members and the exact size of the Class through discovery and Defendants' records.

77.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Common questions include, but are not limited to, the following:

    a.   Whether Defendants' Honey browser extension diverts commissions from Plaintiff and Class members to PayPal;

    b.   Whether Defendants' conduct and actions interfered with Plaintiff's and Class members' prospective economic advantage;

    c.   Whether Defendants' conduct and actions interfered with Plaintiff's and Class members' contractual relations with eCommerce merchants;

    d.   Whether Defendants have been unjustly enriched because of the conduct complained of herein;

    e.   Whether Defendants engaged in false or misleading advertising in violation of the Lanham Act;

    f.   Whether Defendants' conduct and actions violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; and

    g.   Whether Plaintiff and Class members are entitled to relief, including damages and equitable relief.

78.    **Typicality (Fed. R. Civ. P. 23(a)(3))**. Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the Class members. Plaintiff, like all Class members, was subjected to Defendants' practice of diverting commissions from them to PayPal. Accordingly, Plaintiff's claims are typical of other Class members' claims because they arise from the same course of conduct by Defendants, and the relief sought is common to Class members.

79.    **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Pursuant to Rule 23(a)(4), Plaintiff and its counsel will fairly and adequately protect the interests of the Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the Class members.

Plaintiff has retained counsel experienced in prosecuting class actions and the claims alleged herein.

80.    **Superiority (Fed. R. Civ. P. 23(b)(3))**. Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

81.    **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

a.    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants; or

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

82.    **Issue Certification (Fed. R. Civ. P. 23(c)(4))**. In the alternative, the common questions of fact and law, set forth in Paragraph 77, are appropriate for issue certification on behalf of the proposed Class.

## VII. TOLLING OF THE STATUTES OF LIMITATIONS

83.     **Discovery Rule.** Plaintiff's and Class members' claims accrued upon discovery of Defendants' practice of cheating them out of commissions by the web browser extension, PayPal Honey. While Defendants knew, and concealed, the facts that they were stealing sales commissions from Plaintiff and Class members by swapping in their own affiliate cookies when a consumer clicks on the Honey extension – thus taking credit for Plaintiff's and Class members' sales, Plaintiff and Class members could not and did not discover these facts sooner through reasonable diligent investigation. Plaintiff did not discover Defendants' practices until reading relevant articles and news reports that were published beginning in December 2024.

84.     **Active Concealment Tolling**. Any statutes of limitations are tolled by Defendants' knowing and active concealment of their practice of stealing sales commissions from Plaintiff and Class members by swapping in their own affiliate cookies when a consumer clicks on the Honey extension – thus taking credit for Plaintiff's and Class members' sales, as described above. Defendants kept Plaintiffs and all Class members ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiff or Class members. The details of Defendants' efforts to conceal their above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiff and Class members, and await discovery. Plaintiff could not reasonably have discovered Defendants' practice of cheating them out of commissions through the web browser extension, PayPal Honey. Because Defendants actively concealed, and continued to actively conceal, the facts that they were stealing sales commissions from Plaintiff and Class members by swapping in their own affiliate cookies when a consumer clicks on the Honey extension – thus taking credit for Plaintiff's and Class members' sales, they are estopped from relying on any statute of limitations defense and/or all statutes of limitations for the claims of Plaintiff and the putative Class members have been tolled.

85.     **Estoppel**. Defendants were and are under a continuous duty to disclose to Plaintiff and all Class members that they were stealing sales commissions from Plaintiff and Class members by swapping in their own affiliate cookies when a consumer clicks on the Honey extension – thus taking credit for Plaintiff's and Class members' sales. At all relevant times, and continuing to this

day, Defendants knowingly, affirmatively, and actively concealed the facts that they were stealing sales commissions from Plaintiff and Class members by swapping in their own affiliate cookies when a consumer clicks on the Honey extension – thus taking credit for Plaintiff's and Class members' sales. The details of Defendants' efforts to conceal the above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiff and Class members, and await discovery. Plaintiff reasonably relied upon Defendants' active concealment. Based on the foregoing, Defendants are estopped from relying upon any statutes of limitation in defense of this action.

86.    **Equitable Tolling**. Defendants took active steps to conceal the fact that they wrongfully, improperly, illegally, and repeatedly stole sales commissions from Plaintiff and Class members by swapping in their own affiliate cookies when a consumer clicks on the Honey extension – thus taking credit for Plaintiff's and Class members' sales. The details of Defendants' efforts to conceal the above-described unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiff and Class members, and await discovery. When Plaintiff learned about this material information, it exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing its claims. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

**VIII. CAUSES OF ACTION**

**COUNT ONE**
**VIOLATION OF LANHAM ACT – FALSE ADVERTISING**

87.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

88.    Plaintiff alleges this cause of action on behalf of itself and the proposed class, and in so doing, incorporates all preceding allegations.

89.    Defendants' conduct, as alleged herein, violates Section 43(a)(1)(B) of the Lanham Act, which prohibits the use in commerce of any word, term, name, symbol, or device that misrepresents the nature, characteristics, qualities, or geographic origin of their, or Plaintiff's, goods, services, or commercial activities. Defendants violated the Lanham Act by making

numerous misrepresentations on app stores, on the Honey website, in Honey marketing, and elsewhere, that falsely misled consumers into believing that by installing and using the Honey browser extension they were getting the best available discounts when in fact, they were not.

90.    Defendants made false and/or misleading misrepresentations on the Honey website regarding the nature and characteristics of their goods, services, and commercial activities by stating: "Find the latest cash back offers and coupon codes while you browse online. Our shopping extension automatically searches for you. Then applies the best one it can find at checkout." Similar representations made by Defendants, include "we'll search millions of active coupon codes. And quickly apply the biggest savings we can find," that with Honey, consumers can "automatically apply the best available coupons," and that "Honey applies the best available coupon codes to your cart at checkout."

91.    Defendants' advertising representation that, "With just a single click, Honey will find every working code on the internet and apply the best one to your cart," even led the Better Business Bureau's National Advertising Division to open an investigation into Honey's marketing practices.

92.    The misrepresentations alleged herein gave consumers the false impression that Honey was actively scouring the internet for the best discount codes available and providing those discounts to consumers using the Honey browser extension. When in fact, Defendants worked with Honey's online retail partners to only offer coupons or discount codes that their retail partners wanted them to offer.

93.    Defendants' misrepresentations were designed to deceive, were likely to deceive, and have deceived consumers, inducing consumers to install the Honey browser extension and apply, or attempt to apply, Honey discount codes. These deceptions were material in that they influenced consumer purchasing decisions. As explained above, Defendants' misrepresentations have resulted in injury to Plaintiff and Class members because the Honey browser extension deprives Plaintiff and Class members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

94.    As a direct and proximate result of Defendants' conduct and actions described in this Complaint, Plaintiff and Class members suffered economic harm by being deprived of referral fees and commissions they should have earned from referrals through their affiliate links.

95.    As a result of Defendants' conduct and actions as described above, Defendants are liable to Plaintiff and Class members for damages and disgorgement of profits in amounts to be determined at trial.

96.    Pursuant to 15 U.S.C. § 1117, Plaintiffs and Class Members seek an order prohibiting Defendants from the misconduct alleged herein and an award of monetary relief, including disgorgement of Defendants' profits, damages according to proof, and as the Court may allow, costs of suit, and attorneys' fees.

## COUNT TWO

## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*

97.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

98.    Plaintiff alleges this cause of action on behalf of itself and the proposed class, and in so doing, incorporates all preceding allegations.

99.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice[.]"

100.    Defendants' business acts and practices are unlawful because they interfere with the prospective economic advantage of Plaintiff and Class members, and contractual relations between Plaintiff and Class members and eCommerce merchants, and constitute conversion, as described in this Complaint. Defendants' business acts and practices also have unjustly enriched Defendants, as described in this Complaint.

101.    Defendants committed unfair business practices by using the Honey browser extension to steal and take credit for Plaintiff's and Class members' work in referring their followers to eCommerce merchants as the true originators of sales arising from their affiliate links,

and thus divert referral fees and commission payments that rightfully belong to Plaintiff and Class members.

102.    Defendants' acts and practices are unfair in violation of the UCL because they violate California's public policy against interfering with another's prospective economic advantage.

103.    Defendants' conduct also constitutes unfair business practices for at least the following reasons: (a) the gravity of harm to Plaintiff and Class members from Defendants' acts and practices far outweighs any legitimate utility of that conduct; (b) the conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and Class members; (c) the injury is not one that Plaintiff and Class members reasonably could have avoided; (d) the conduct undermines or violates the stated public policies underlying the laws alleged herein.

104.    As a direct and proximate result of Defendants' unlawful and unfair business practices, Plaintiff and Class members suffered injury in fact and lost money or property by being deprived of their referral fees and commissions that they rightfully earned from referrals through their affiliate links.

105.    Defendants' conduct and actions, as alleged in this Complaint, are continuing and there is no indication that Defendants will stop in the future.

106.    Plaintiff brings this claim on behalf of the Class in the alternative to any claims brought for legal remedies and expressly allege that for purposes of this claim they lack adequate remedies at law. In addition, the restitution that may be available under this claim, including for restitutionary disgorgement of revenues attributable to an increased volume of sales made possible by the challenged practices, may not be recoverable as damages or otherwise at law. Plaintiff, individually and as a member of the Class, has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

107.    Plaintiff requests that this Court enter such orders and judgments as may be necessary to restore to Plaintiff and Class members any money Defendants acquired by unfair

competition, including restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

**COUNT THREE**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

108.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

109.    Plaintiff alleges this cause of action on behalf of itself and the proposed class, and in so doing, incorporates all preceding allegations.

110.    Plaintiff and Class members and third parties, eCommerce merchants, have an existing economic relationship that is reasonably likely to produce economic benefits to Plaintiff and Class members, whereby Plaintiff and Class members refer their network of followers to those eCommerce merchants through affiliate links. In return, eCommerce merchants provide Plaintiff and Class members with referral fees or commissions. This economic relationship is ongoing, and Plaintiff and Class members expect to continue earning commissions in exchange for referrals from these third parties.

111.    Defendants knew or should have known of the economic relationship between Plaintiff and Class members and the eCommerce merchants, namely that Plaintiff and Class members receive referral fees or commissions from eCommerce merchants for referring their followers to those eCommerce merchants through affiliate links.

112.    Through use of the Honey browser extension, Defendants divert referral fees and commission payments from Plaintiff and Class members who promoted and shared an affiliate link and generated the referral and ultimate sale of an eCommerce merchant's product or service. As discussed above, Defendants displace tracking tags that point to online marketers as the source of the referral, substitute their own tracking tags, and hold themselves out as the referrer of the specific products and/or services even though the sale in question originated from an online influencer's affiliate marketing link. Accordingly, Defendants' conduct and actions were designed to disrupt the relationship between Plaintiff and Class members and the eCommerce merchants.

CLASS ACTION COMPLAINT

113.    Defendants either intended to appropriate referral fees and commissions from Plaintiff and Class members through the conduct and actions alleged herein or knew that their conduct would appropriate referral fees and commissions from Plaintiff and Class members.

114.    Plaintiff and Class Members were harmed by Defendants' conduct and actions because the Honey browser extension deprives Plaintiff and Class Members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

115.    As a direct and proximate result of Defendants' conduct and actions described in this Complaint, Plaintiff and Class members suffered economic harm by being deprived of referral fees and commissions they should have earned from referrals through their affiliate links.

116.    As a result of Defendants' conduct and actions as described above, Defendants are liable to Plaintiff and Class members for damages in an amount to be determined at trial.

**COUNT FOUR**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

117.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

118.    Plaintiff alleges this cause of action on behalf of itself and the proposed class, and in so doing, incorporates all preceding allegations.

119.    Plaintiff and Class members had existing contractual relationships with one or more of the eCommerce merchants.

120.    Defendants knew of the existence of the contractual relationships between Plaintiff and Class members and eCommerce merchants whereby Plaintiff and Class members refer their followers to those eCommerce merchants through affiliate links. Pursuant to their contractual relationships, in return, eCommerce merchants provide Plaintiff and Class members with referral fees or commissions, sometimes as high as 40%.

121.    Defendants' conduct and actions deprived Plaintiff and Class members of the benefits of their contractual agreements with third parties and otherwise interfered with the contractual obligations arising under their contracts with third parties.

CLASS ACTION COMPLAINT

122.    Defendants intended to interfere or disrupt the performance under Plaintiff's and Class members' contracts with third parties or knew that their actions made performance more expensive or burdensome.

123.    Defendants' interference harmed Plaintiff and Class members through use of the Honey browser extension whereby Defendants divert referral fees and commission payments from Plaintiff and Class members who promoted and shared an affiliate link and generated the referral and ultimate sale of an eCommerce merchant's product or service. As discussed above, Defendants displace tracking tags that point to online marketers as the source of the referral, substitute their own tracking tags, and hold themselves out as the referrer of the specific products and/or services even though the sale in question originated from an online marketer's affiliate marketing link. As a result, Plaintiff's and Class members' number of customer acquisitions via affiliate links appear to their contracted eCommerce merchants as underperforming relative to actual customer acquisitions.

124.    Defendants' conduct was a substantial factor in causing Plaintiff and Class members' harm.

125.    As a result of Defendants' conduct and actions as described above, Defendants are liable to Plaintiff and Class members for damages in an amount to be determined at trial.

**<u>COUNT FIVE</u>**
**<u>CONVERSION</u>**

126.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

127.    Plaintiff alleges this cause of action on behalf of itself and the proposed class, and in so doing, incorporates all preceding allegations.

128.    Plaintiff and Class Members possessed or had a right to possess referral fees and commissions they earned from referring consumers to products and services sold by eCommerce merchants. The amount of each referral fee or commission earned by Plaintiff and Class Members constituted a specific and identifiable sum that was taken from them by Defendants.

CLASS ACTION COMPLAINT

129.   Defendants intentionally interfered, asserted or assumed dominion or control over Plaintiff's and Class members' personal property by appropriating referral fees and commissions owed to Plaintiff and Class members from eCommerce merchants.

130.   Defendants, without consent and proper authorization, assumed and exercised the right of ownership over the referral fees and commissions earned by Plaintiff and Class members, without justification.

131.   Defendants' wrongful exercise of dominion or control over Plaintiff's and Class members' personal property constitutes conversion.

132.   Plaintiff and Class members neither expressly or impliedly assented to nor ratified Defendants' interference with their referral fees and commissions.

133.   As a direct and proximate result of Defendants' conversion, Plaintiff and Class members were harmed.

134.   Defendants are liable to Plaintiff and Class members for damages and costs permitted by law.

## COUNT SIX
## UNJUST ENRICHMENT

135.   Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

136.   Plaintiff alleges this cause of action on behalf of itself and the proposed class, and in so doing, incorporates all preceding allegations.

137.   Plaintiff and Class members have an interest, both equitable and legal, in their rightfully earned referral fees and commissions. Because of Defendants' wrongful conduct and actions as alleged herein, Plaintiff and Class members were wrongfully deprived of their earned referral fees and commission payments.

138.   Because of Defendants' wrongful conduct and actions as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiff and Class members through use of the Honey browser extension whereby Defendants divert referral fees and commission payments from Plaintiff and Class members who promoted and shared an affiliate link and generated the referral

and ultimate sale of an eCommerce merchant's product or service. As discussed above, Defendants displace tracking tags that point to online marketers as the source of the referral, substitute their own tracking tags, and hold themselves out as the referrer of the specific products and/or services even though the sale in question originated from an online marketer's affiliate marketing link.

139.    Defendants wrongfully retained the benefits conferred on them by Plaintiff and Class members.

140.    It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

141.    Plaintiff brings this claim on behalf of the Class in the alternative to any claims brought for legal remedies and expressly allege that for purposes of this claim they lack adequate remedies at law. In addition, the restitution that may be available under this claim, including for disgorgement of profits attributable to an increased volume of sales made possible by the challenged practices, may not be recoverable as damages or otherwise at law. Plaintiff, individually and as a member of the Class, has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

142.    Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class defined above, respectfully requests that this Court enter:

(a) An order certifying this case as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as the Class representative, and appointing the undersigned as Class counsel;

(b) A judgment awarding Plaintiff and Class members appropriate monetary relief, including actual damages, equitable relief, restitution, and disgorgement;

CLASS ACTION COMPLAINT

(c) An order entering injunctive and declaratory relief as appropriate under the applicable law;

(d) An order awarding Plaintiff and the Class pre-judgment and/or post-judgment interest as prescribed by law;

(e) An order awarding reasonable attorneys' fees and costs as permitted by law; and

(f) All other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: January 14, 2025

GIBBS LAW GROUP LLP

*/s/ Rosemary M. Rivas*
Eric H. Gibbs
Rosemary M. Rivas
Joshua J. Bloomfield
Rosanne L. Mah
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
ehg@classlawgroup.com
rmr@classlawgroup.com
jjb@classlawgroup.com
rlm@classlawgroup.com

*Attorneys for Plaintiff Lyon Fitness, LLC*

CLASS ACTION COMPLAINT